UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ISAAC SIEH FORH,

                        Petitioner,

v.                                          Case No. 3:19-cv-498-MMH-PDB

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

                        Respondents.

_____

## ORDER

### I. Status

Petitioner Isaac Sieh Forh, an inmate of the Florida penal system,
initiated this action on April 29, 2019,[1] by filing a Petition for Writ of Habeas
Corpus under 28 U.S.C. § 2254 (Petition; Doc. 1) and a Memorandum of Law
and Facts (Memorandum; Doc. 2).[2] In the Petition, Forh challenges a 2012
state court (St. Johns County, Florida) judgment of conviction for robbery with
a firearm. He raises two claims. See Petition at 4-6; Memorandum at 5-14.
Respondents have submitted a memorandum in opposition to the Petition. See

---

[1] See Houston v. Lack, 487 U.S. 266, 276 (1988) (mailbox rule).

[2] For purposes of reference to pleadings and exhibits, the Court will cite the
document page numbers assigned by the Court's electronic docketing system.

Response (Doc. 8). They also submitted exhibits. See Docs. 9-1 through 9-16. Forh filed a brief in reply. See Reply (Doc. 10). This action is ripe for review.

## II. Relevant Procedural History

On October 12, 2011, the State of Florida charged Forh with robbery with a firearm in St. Johns County case number 2011-CF-1868. See Doc. 9-1 at 28. On July 26, 2012, at the conclusion of a trial, the jury found Forh guilty as charged and also determined that Forh was "in actual possession of a firearm" during the robbery. Doc. 9-2 at 18, Verdict. On August 22, 2012, the circuit court sentenced Forh to a thirty-year term of imprisonment with a ten-year mandatory minimum sentence for "actual possession" of the firearm. Docs. 9-2 at 27-36, Judgment; 9-6 at 161-62, Transcript of Sentencing Hearing.

On direct appeal, Forh, with the benefit of counsel, filed an initial brief, arguing that the trial court erred when it denied his motion for recusal (ground one) and refused to hear his motion to suppress eyewitness identification and consider a special jury instruction related to the eyewitness testimony (ground two). See Docs. 9-6 at 170-73; 9-7; 9-8 at 1-14. He also asserted that a successor judge erred when he entered a September 12, 2012 order clarifying the sentence (ground three). See Doc. 9-8 at 15-21.[3] The State filed an answer brief, see Doc. 9-8 at 23-43, and Forh filed a reply brief, see Docs. 9-8 at 45-53; 9-9 at

---

[3] Doc. 9-3 at 34 (stating "it is the [c]ourt's intent that the 30 year sentence imposed upon [Forh] run consecutive[ly] to any active sentence [Forh] was serving").

1-7. On December 23, 2013, the appellate court (Fifth DCA) affirmed Forh's conviction and sentence per curiam without issuing a written opinion, see Doc. 9-9 at 9, and issued the mandate on January 16, 2014, see id. at 10.

Forh filed a pro se motion to correct illegal sentence pursuant to Florida Rule of Criminal Procedure 3.800 on January 29, 2014. See id. at 12-15. The circuit court denied the Rule 3.800 motion on March 12, 2014. See id. at 17-19. On Forh's appeal, the Fifth DCA affirmed the circuit court's denial per curiam on August 19, 2014, see id. at 36, and issued the mandate on September 12, 2014, see id. at 37. He filed a second pro se Rule 3.800 motion on December 15, 2014. See id. at 65-73. The circuit court denied the motion on June 2, 2015. See id. at 75-76. Forh did not appeal the circuit court's denial.

During the pendency of the second Rule 3.800 motion, on January 6, 2015, Forh filed a pro se petition for writ of habeas corpus. See id. at 39-47. In the petition, he asserted that appellate counsel was ineffective because she failed to raise the following issues on direct appeal: the trial court failed to conduct a Richardson[4] hearing to address the State's three discovery violations (failure to provide the audio recording of the victim's interview and the Adidas store's surveillance footage, and failure to disclose the victim's daughter as an

---

[4] Richardson v. State, 246 So.2d 77 (Fla. 1971).

3

eyewitness until after the jury was sworn). The State filed a response. See id. at 49-59. The Fifth DCA denied the petition on July 14, 2015. See id. at 63.

Next, on December 14, 2015, Forh filed a pro se motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. See id. at 82-98. In his Rule 3.850 motion, Forh asserted that his trial counsel was ineffective because he failed to: timely file a notice of alibi and pursue an alibi defense (ground one); file a petition for writ of prohibition when the trial judge refused to disqualify herself (ground two); timely file a motion to suppress eyewitness identification testimony (ground three); object to the verdict form which permitted the jury to make a finding that Forh "actually possessed" a firearm (ground four); and investigate and obtain an expert to testify about trans-racial misidentification (ground five). See id. at 84-95. He also asserted that counsel's cumulative errors denied him a fair trial. See id. at 96. The State responded, see Docs. 9-9 at 103-08; 9-10 at 1-18, and Forh replied, see Doc. 9-10 at 20-38. On October 26, 2017, the circuit court denied Forh's Rule 3.850 motion as to a portion of ground one (related to Forh's assertions that counsel failed to timely file a notice of alibi and failed to investigate and present an alibi defense with respect to Forh's credit card records), and also denied grounds two, three, and four. See Docs. 9-10 at 40-47; 9-11 at 1-6. The Court did not address ground five because Forh voluntarily dismissed the ground. See Docs. 9-10 at 36; 9-11 at 5. On March 16, 2018, the court held an evidentiary hearing (addressing the

portion of ground one related to Forh's assertions that counsel failed to investigate and present an alibi defense with respect to the cell phone records), at which court-appointed counsel represented Forh. See Docs. 9-11 at 71-77; 9-12 through 9-14. The parties filed written closing arguments. See Docs. 9-14 at 15-20; 9-15. The circuit court denied Forh's Rule 3.850 motion with respect to the claim on April 10, 2018. See Doc. 9-16 at 2-9. On appeal, Forh's counsel filed an Anders[5] brief, see id. at 39-49, and Forh filed a pro se initial brief, see id. at 51-72. On December 31, 2018, the Fifth DCA affirmed the circuit court's denial of Forh's Rule 3.850 motion per curiam without issuing a written opinion, see id. at 74, and on January 24, 2019, issued the mandate, see id. at 75.

### III. One-Year Limitations Period

This action was timely filed within the one-year limitations period. See 28 U.S.C. § 2244(d).

### IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a

---

[5] Anders v. California, 386 U.S. 738 (1967).

hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318-19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Forh's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011) (quotation marks omitted)). As such, federal habeas review of final state court decisions is "'greatly circumscribed' and 'highly deferential.'"

Id. (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011) (quotation marks omitted)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 1192, 1196.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97-98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.
>
> Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. ---, ---, 134 S.

8

Ct. 10, 15, 187 L.Ed.2d 348 (2013); accord Brumfield v. Cain, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"[6] Titlow, 571 U.S. at ---, 134 S. Ct. at 15 (quoting Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016); see Teasley v. Warden, Macon State Prison, 978 F.3d 1349, 1356 n.1 (11th Cir. 2020). Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. See Cullen v. Pinholster, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" Tharpe, 834 F.3d at 1338 (quoting Richter, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet.

---

[6] The Eleventh Circuit has described the interaction between § 2254(d)(2) and § 2254(e)(1) as "somewhat murky." Clark v. Att'y Gen., Fla., 821 F.3d 1270, 1286 n.3 (11th Cir. 2016).

Richter, 562 U.S. at 102. A district court's obligation is "to train its attention" on the legal and factual basis for the state court's ruling, not to "flyspeck the state court order or grade it." Meders v. Warden, Ga. Diagnostic Prison, 911 F.3d 1335, 1349 (11th Cir. 2019) (citing Wilson, 138 S. Ct. at 1191-92), cert. denied, 140 S. Ct. 394 (2019). Thus, to the extent that a petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

### B. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S. Ct. 2052.

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>, at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Id.</u>, at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u>, at 687, 104 S. Ct. 2052.

<u>Richter</u>, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward</u>, 592 F.3d at 1163. Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Id.</u> (citing <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in <u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." <u>Strickland</u>, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." <u>Richter</u>, 562 U.S. at ---, 131 S.Ct. at 788. But "[e]stablishing that a state court's application of <u>Strickland</u> was unreasonable under §

11

2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." <u>Id.</u> (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable — a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at ---, 131 S. Ct. at 788.

<u>Hittson v. GDCP Warden</u>, 759 F.3d 1210, 1248 (11th Cir. 2014); <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the deference to counsel's performance mandated by <u>Strickland</u>, the AEDPA adds another layer of deference — this one to a state court's decision — when we are considering whether to grant federal habeas relief from a state court's decision." <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

As ground one, Forh asserts that the trial court erred when it failed to suppress the State's eyewitness identification evidence that was obtained as a result of law enforcement's overly suggestive procedures. Forh argued this

issue on direct appeal, <u>see</u> Docs. 9-8 at 5-9; 9-9 at 1-4; the State filed an answer brief, <u>see</u> Doc. 9-8 at 31-39; and the Fifth DCA affirmed Forh's conviction per curiam, <u>see</u> Doc. 9-9 at 9.

In its appellate brief, the State addressed the claim on the merits, <u>see</u> Doc. 9-8 at 31-39, and therefore, the appellate court may have affirmed Forh's conviction based on the State's argument. If the appellate court addressed the merits of the claim, the state court's adjudication is entitled to deference under AEDPA. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law and did not involve an unreasonable application of clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Forh is not entitled to relief on the basis of this claim.

Even assuming that the state court's adjudication of the claim is not entitled to deference, Forh's claim of trial court error is nevertheless without merit. The Supreme Court has recognized "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." <u>Perry v. New Hampshire</u>, 565 U.S. 228, 232 (2012). An out-of-court identification is subject to exclusion if the

13

identification procedure was unduly suggestive such that it created a substantial risk of misidentification. Neil v. Biggers, 409 U.S. 188, 199 (1972). In determining whether an identification violates due process, a court undertakes a two-part analysis. "First, we must determine whether the original identification procedure was unduly suggestive.... If we conclude that the identification procedure was suggestive, we must then consider whether, under the totality of the circumstances, the identification was nonetheless reliable." Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988) (citing Biggers, 409 U.S. at 199). The pertinent question is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Biggers, 409 U.S. at 199. The Supreme Court has identified the following five factors to be considered in determining whether the identification was reliable: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the description of the suspect; (4) the level of certainty of the identification; and (5) the length of time between the crime and the identification. See id. Notably, in Manson v. Brathwaite, 432 U.S. 98 (1977), the Supreme Court stated that absent "a very substantial likelihood of irreparable misidentification," the identification of a suspect by a witness is evidence for the jury to weigh. Id. at 116 (citation and internal quotation marks omitted).

> We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

Id.

The following chronology is relevant to the issue. In the instant case, Forh requested that the court continue the June 18, 2012 trial to seek additional evidence. See Doc. 9-1 at 70. The trial was rescheduled for Monday, July 16, 2012, see id. at 81, 96; the jury was selected and sworn that day; and the judge stated that the trial would start the following week on July 26th. See Doc. 9-6 at 122-23. Outside the presence of the jury, the prosecutor and defense counsel discussed the St. Johns County photographic lineup as well as a photograph of Forh that law enforcement authorities in another county emailed to the St. Johns County officials,[7] and defense counsel notified the court that he would discuss with Forh any issues related to pretrial identification. See id. at 127-30. On Wednesday, July 25th, Forh filed a counseled Motion to Suppress Eyewitness Identification Testimony and Request for a Hearing in Advance of Trial.[8] See Doc. 9-1 at 100-06. In the

---

[7] See Doc. 9-3 at 48.

[8] The certificate of service shows that defense counsel furnished a copy of the motion to the State Attorney on July 23, 2012, at 7:20 p.m. See Doc. 9-1 at 106.

motion, Forh asked that the court suppress the pretrial identifications of Forh by Douglas Burnett (the victim), Araan Quinney, and their children "as being the product of an impermissibly suggestive identification procedure in violation of due process under the Fifth and Fourteenth Amendments." Id. at 100. As to the underlying facts, Forh stated in pertinent part:

> At some time during the investigation of this case[,] detective David Garns of the St. Johns County Sher[]iff's Office received an email of a suspect that was alleged to be Isaac Forh from another county. This email was then sent to the victim in this case, Douglas Burnett. This police procedure made any subsequent identification of the Defendant unnecessarily suggestive. Furthermore, considering all the circumstances, the above procedure gave rise to a substantial likelihood of irreparable misidentification of the Defendant.

> Further, after emailing the victim a picture of the Defendant, a photo of the Defendant was then placed in a photo pack with five other individuals. At the time the photo pack was put together, the photo of the Defendant was an old photo when he was heavier, there was only one person of similar weight [to] the Defendant, and the other four people in the photo pack were much lighter than the Defendant in weight, so as to create a substantial likelihood of irreparable misidentification of the Defendant.

> These are not witnesses with an independent memory of the perpetrator's identity. The undersigned counsel's understanding is that the wife of the victim who was standing outside the door when the suspect left, did not pick the Defendant out of the photo pack, however, the victim Mr. Burnett did identify the Defendant from the photo pack. In short, the objective facts of this case demonstrate that the only thing that

> the identification shows is that the investigators utilized a highly suggestive procedure on the witnesses.

Id. at 101-02.

Before opening statements on July 26th, the trial court addressed Forh's motion to suppress, stating in pertinent part:

> This motion is not something that's new. This isn't an issue that's new. This is identification testimony, including not only children, but Mr. Burnett, the alleged victim, and --
>
> . . . .
>
> Well, we're not going to hear the motion because the motion was late. The motion to suppress is to be filed before trial. This motion was not filed before trial.
>
> This jury was sworn last Monday. The trial has begun. I'm not going -- this motion is -- there's nothing new in this motion. The issues regarding the alleged victim's identification ha[ve] been known well in advance. This motion could have been filed well in advance of this -- of this hearing -- of the trial, and I'm not going to hear it. It's untimely.

Doc. 9-3 at 43-44. When defense counsel objected to the court's ruling, the court stated:

> Okay. Your objection is overruled. You did have notice. Although you did not have a date certain from the Court, the Rules of Criminal Procedure say that a motion to suppress will be filed before trial.
>
> Your Motion to Suppress was filed after the trial ha[d] begun. This jury was sworn last Monday.

17

There's no possibility for us to hear this motion, which is not a very -- a simple motion. It's a motion that will take time to hear. The jury is waiting.

I had all -- to the extent that you could petition the Court to maybe file this motion late, I doubt that I would have granted it, but last week I had some time. You knew because I made counsel fully aware -- when you were asking me questions about last week when the courtroom will be available to come and maybe figure out how to work the electronics in the courtroom -- that we didn't have court last week and that I'd be available last week if anybody needed me, that I would be out of town on Monday and Tuesday of this week, that Wednesday of this week I was -- had a full day of court, and then we had the trial today.

And you filed the motion -- faxed the motion to the Court Monday night of this week, and I didn't find out about it until late Tuesday. No contacting of my judicial assistant to see if there would be any way that we could have time to hear this motion before -- before the -- court today. You weren't here early today to see if there was any way we could potentially go over any of these issues.

Your motion is late. It's late pursuant to the Rule of Criminal Procedure. I will not hear the motion.

Id. at 46-47.

At trial, the court instructed the jury in relevant part:

It is up to you to decide what evidence is reliable. You should use your common sense in deciding which is the best evidence, and which evidence should not be

> relied upon in considering your verdict. You may find
> some of the evidence not reliable, or less reliable.

Doc. 9-3 at 63. During the trial, Douglas Nelson Burnett (the victim) testified

about the circumstances surrounding the Sunday afternoon robbery on August

21, 2011. He stated in pertinent part:

> As I got this uncomfortable feeling that the one
> man hadn't gone to the restroom and the other man
> had gone from the urinal to the stall immediately
> behind me, I decided to start leaving. I figured I
> needed to get out of there, just to make sure and just
> to be cautious.
>
> And as I started to go towards the hand dryers
> and the door, I felt a tug on my shorts. I was wearing
> a pair of those men's cargo shorts where it has the side
> pocket on the side. And I had taken my wife's
> checkbook wallet and put it in on the right side in that
> cargo short. It would barely fit. It was a pretty tight fit
> to get it in there. And I felt a tug on -- on my shorts,
> and I looked down and saw that someone was grabbing
> ahold of that checkbook wallet, trying to get it out of
> my pocket.[9]
>
> . . . .
>
> Well, he couldn't get it out. When he initially
> grabbed that and I felt him tugging, he was, like,
> working to try and get it out.
>
> And he said to me, "I'm going to take this." And
> when he did -- or as he was saying that, I reached my
> hand down and grabbed his wrist. And as I grabbed
> his wrist, he was -- he had a motion like he was just

---

[9] At trial, Burnett confidently identified Forh as the robber and stated that
Forh "is considerably thinner today than he was then." Docs. 9-3 at 80, 102-03; 9-4 at
1 ("I'm absolutely sure that that's him."), 7, 40.

going to pull it out of my pocket and walk out the door.

So[,] as he's passing me and grabbing ahold of it, pulling it out of my pocket, I reached down and grabbed his wrist when he said[,] "I'm taking this," and I said[,] "No you're not." And I grabbed his wrist, and it stopped him from going towards the door. He then squared up face-to-face with me.

Id. at 79-81. According to Burnett, he has "better than 20/20 vision," the bathroom was "well lit" with fluorescent ceiling lights, and he and the robber were within "[a] foot" of each other during a brief physical struggle. Id. at 81-84, 96-97. He described what transpired when the robber pulled out a gun.

As [the robber] brought the gun up, the immediate thing that came to my mind was to stop resisting, to stop fighting with him at all. And as he brought the gun up, he leveled it straight towards my face. And with his arm extended, the gun was about this range (indicating). His body would have been farther. But the gun was, you know, right here at my face.

When he was doing that with the gun in my face, I was slowly moving my head side to side so that the barrel -- I was trying to keep the barrel to where it wasn't aligned perfectly at me, that if he started to pull the trigger I'd be off to the side one way or the other.

He said to me at that point in time –

. . . .

He said, "I'll f--king kill you." He said -- and it was like he stuttered -- he said, "Your family, your kids are right outside. I'll f--king kill your kids. Think of your family."

And it registered to me very well because it wasn't like a -- everything had changed at that point in time. It wasn't like a fast pace[d] situation at that point in time. It was very slow when I wasn't resisting. And he let it know -- let me know that he was in control, obviously, at which time I had started to back up from him. When he pulled the weapon and started to talk, I had started to back up to him, and I sort of put my head down a little bit just to show that I wasn't going to resist. I put my arms down.

And when I had thrown him to the side to go out the door, I had grabbed -- as he was going to the side, I had grabbed the checkbook wallet and I had it back in my hand. So[,] at this point in time, when I was going out the door, I had the checkbook wallet

So[,] when he pulled the gun and said those things to me, I reached out to hand it to him, because that's what he wanted, so I reached out to hand it to him, and we had a hand-to-hand exchange where I gave it to him, and he took it. And I just started to back up farther and farther away, hoping that then he wouldn't shoot me, or if he did, it wouldn't be a very good shot.

And he told me to stay there, and he turned around and walked out the door. He didn't open the door all the way up. He sort of opened it and turned sideways as he went out the door.

. . . .

But as I came out of the men's room, I'm inside the Food Court, I could look and see that the exterior door going outside from the Food Court, it's a glass door with glass windows on each side, I could see that door closing, and I could see him looking back directly at me through the glass as he's outside starting to run to the north. And at that point in time[,] I started to run after him.

21

<u>Id.</u> at 84-86, 89. He described the robber to law enforcement as a large forty-year-old African-American man with darker skin, "sort of puffy cheeks," and "really big lips" who was "approximately 6 feet tall . . . 250 pounds" wearing a red athletic-wicking Polo-type shirt. <u>Id.</u> at 79, 92, 99. He affirmed that the robber's face was burned in his memory. <u>See id.</u> at 103. He stated that he was able to confidently identify the robber from a photographic lineup that Detective Garns showed him on September 22, 2011 (within one month of the August 21, 2011 robbery).[10] <u>See id.</u> at 101. He stated:

> This was the photo lineup that Detective Garns showed me, and I looked at it. When I saw the picture, I immediately knew who -- what I was looking at and the seriousness of what I was looking at, and identified him. I took a minute to think about his mannerisms and his face that -- the images that I have from remembering the incident of his face, and that's absolutely him, it was him, and so I circled it and signed it, and then left it with Detective Garns.

<u>Id.</u> at 101-02. Burnett affirmed that it was difficult to identify the person in the pixelated surveillance photograph that Detective Garns had emailed him before the photographic lineup, but he noticed features similar to the robber. <u>See</u> Doc. 9-4 at 38-39.

---

[10] Detective Garns testified that he included Forh's driver's license photograph in the photographic lineup. <u>See</u> Doc. 9-4 at 93, 167-68.

Next, Araan Elizabeth Burnett (the victim's wife) testified that she saw

the robber exit the men's bathroom. She stated in pertinent part:

> And I remember my attention went to the door
> immediately, so I was focused on the bathroom door.
> And it looked to me like -- if I was to describe it, it
> looked like somebody was struggling as almost as if
> their shoe or something was stuck under the door. It
> reminded [me] of, like -- like, you could pull it over
> your foot[,] and you push it back and you try it again
> and you push it back.
>
> And all of a sudden there was this big slam and
> it shut back. But I saw physically -- like, I saw  my
> husband, he had on a turquoise linen shirt. So[,] I
> didn't really see him. I saw the shirt. And it looked like
> he was going backward.
>
> And I just kind of froze. Like, I -- I realized at
> that time there was something wrong, so my attention
> was fully on the door, but didn't have any idea what
> was going on at that moment.
>
> . . . .
>
> It wasn't -- like, I can't exactly put a time frame
> on it. It was all happening at the same time.
>
> But shortly after I heard the big slam, and then
> my attention is focused on the door, this very tall
> African-American, like, is shimmying out of the door
> and looks directly at me. And I don't know exactly
> what he said, but it was focused at me, and it was
> either "thank you," or a profanity, ". . . you." And as he
> was shimmying out of the door, he was shoving a gun
> into his waistband, which was, like, tucking his shirt
> into his pants.

And, at that point -- I mean, it was happening so quickly. I didn't realize that it had happened to my husband. So[,] I'm literally frozen.

But I was staring right at him, so I -- you know, I could measure him -- I knew exactly -- he was almost the height of the door frame and the width, and he was a bigger guy -- like, I saw everything.

And he immediately fled on foot out the door. He kind of walked towards the door. And then I saw him, you know, take off towards -- I guess you would consider it the north. He went towards Adidas and the Nike store.

My -- within seconds of him coming out of the bathroom, my husband comes out, and I could see immediately on his face, it's like his eyes were flushing to black. And he was kind of disoriented at the -- like not disoriented that he didn't know what he was doing, but he's, like, "Where did he go? Where did he go?" and I'm, like, "Where did who go?" and he said, "The man that just came out of the bathroom." And I said, "he went that way." And I pointed, like, towards the door.

Doc. 9-4 at 67-69. According to Ms. Burnett, she was in a well-lit area and was within "[t]wo arms' lengths" of the robber when he exited the bathroom. Id. at 70. She testified that she "was looking right at him," and recalled his "wider jaw" and "extremely large" lips. Id. at 74-75. At trial, she identified Forh as the robber and stated that "[h]e's considerably thinner" than he was when he exited the bathroom that day. Id. at 70-71, 77, 79-80. Additionally, Detective Garns testified that Forh had "lost a considerable amount of weight" since October 11, 2011, when the St. Johns County Sheriff's Office took custody of

him. Docs. 9-4 at 95; 9-1 at 18, St. Johns County Sheriff's Office, Booking Information, dated October 11, 2011.

Next, M.E.Q. (Ms. Burnett's daughter) testified about what she saw that afternoon. She stated in pertinent part:

> Well, two men followed [Doug Burnett, her stepfather] in, a guy wearing a red shirt, an African-American in jeans, and another man in a blue shirt and jeans. And after that, maybe 20 seconds later, the guy wearing the blue shirt and jeans walked out. And then the door started rattling very violently.
>
> . . . .
>
> It was, like, going -- opening and shutting very hard and violently and loud. And I saw my step dad's flip-flop and shirt in the door.
>
> . . . .
>
> I wasn't quite sure. I thought at first the door, like, was stuck or something or something was wrong with it. And then it started to concern me when he kept trying to get it open.
>
> . . . .
>
> Mom -- my mom walked out of the bathroom with my two younger sisters, and I showed -- I pointed to my mom to show her the door, and it started rattling. And there was maybe one more time that it opened very wide and shut very hard. And after that, a very tall African-American wearing a red shirt and jeans walked out and in his waistband was a gun.

Doc. 9-4 at 113-14. She identified Forh in the courtroom as the man who walked out of the bathroom with a gun in his waistband. See id. at 115.

25

According to M.E.Q., she looked at Forh's face as he exited the bathroom within five to six feet of her. See id. She remembered his "[v]ery large lips" and "wide face" and "almost cone shaped a little bit" head. Id. at 116-17. She stated that he was skinnier and had longer hair at trial. See id. at 117.

Upon review, the trial court did not err when it decided not to hold a pretrial hearing on the untimely motion to suppress. See Powell v. State, 717 So.2d 1050, 1052 (Fla. 5th DCA 1998) ("Such [suppression] motions should be heard and disposed of in advance of the trial date for many reasons, if at all possible. It avoids the delay and confusion at trial mentioned by Savioe.[11] It also enables each party to plan the orderly presentation of their case[s], knowing what evidence or testimony will or will not be admissible."); see also Fla. R. Crim. P. 3.190. Notably, in his Rule 3.850 motion, Forh asserted that counsel was ineffective because he failed to timely file the motion to suppress. See Docs. 9-9 at 89-91; 9-10 at 31-35. In denying the Rule 3.850 motion as to the ineffectiveness claim, the postconviction court stated in pertinent part:

> In ground three, Defendant claims that trial counsel was ineffective for failing to timely file a motion to suppress eyewitness identification testimony. Defendant asserts that the testimony from the victim, Detective Garns, as well as the testimony of the victim's fiancé and her children, demonstrated that there were problems with the identification of Defendant as the robber in the instant case. Specifically, Defendant contends the procedure

---

[11] Savioe v. State, 422 So.2d 308 (Fla. 1982).

whereby the victim identified Defendant was impermissibly suggestive. The record reflects that counsel attempted to file a motion to suppress raising the same concerns as Defendant argues in his motion just prior to trial. (Motion to Suppress Eyewitness Identification Testimony, Jul. 23, 2012, attached hereto as Appendix H.) Defendant contends that due to the untimeliness of the motion, Judge Berger declined to address the motion on its merits prior to trial. (Tr. of Proceedings, Jul. 26, 2012, Vol. I, pp. 6-8, attached hereto as Appendix I.) However, the record reflects that Judge Berger in fact did address the motion on its merits subsequent to hearing the eyewitness testimony at trial:

> THE COURT: The alleged victim in this case, Mr. Burnett, has identified Mr. Forh as the person who robbed him. It will be up to the jury to weigh the credibility based on all the other evidence, in this case. And I believe, having looked at the evidence, it's sufficient evidence to have the matter go to the jury. And for that reason, I'm going to deny the motion to – for judgment of acquittal.
>
> I will revisit now, just for the record, the – y'all can have a seat – revisit, for the record, the Motion to Suppress, the eyewitness identification testimony and request for a hearing in advance of trial that I had said I was not going to hear today.
>
> Having reviewed the motion, having had the opportunity to sit and listen to the evidence and hear all the evidence in court today, to view the photo lineup of the six individuals, I'm viewing it, the photo lineup to me does not appear to be unduly suggestive in any way. The individuals in

the photo lineup all resemble one another, although some are of varying weight. They are all very similar in nature. Specifically, I mean four of them very, very similar of the six in nature.

I've listened to the testimony of all the witnesses. And on the merits of the motion, having heard everything, I would deny it at this time. So[,] I just wanted to go ahead and put that on the record as well.

(Tr. of Proceedings, Jul. 26, 2012, Vol. II, pp. 264-265, attached hereto as Appendix J.)[12] Thus, the record clearly reflects that had counsel filed a timely motion to suppress, Judge Berger would have denied that motion after hearing the proffered testimony of the witnesses and reviewing the lineup. Accordingly, Defendant cannot establish any prejudice from counsel's failure to present the motion in a more timely fashion. Because the Court finds that Defendant has failed to establish prejudice, the performance component of this claim will not be addressed. <u>Kennedy</u>, 547 So.2d, at 914.[13] Consequently, ground three will be denied.

Doc. 9-11 at 2-3 (emphasis deleted). The Fifth DCA affirmed the postconviction court's denial of Forh's Rule 3.850 motion per curiam without issuing a written opinion. <u>See</u> Doc. 9-16 at 74.

On this record, even assuming that the photographic lineup was suggestive, the identification of Forh by the victim was reliable under the

---

[12] Doc. 9-5 at 1-2.

[13] <u>Kennedy v. State</u>, 547 So.2d 912 (Fla. 1989).

factors identified in <u>Neil v. Biggers</u>. Additionally, Ms. Burnett's and M.E.Q.'s in-court identifications of Forh were reliable. The trial court did not err when it ultimately denied Forh's motion to suppress, and no due process violation occurred. Thus, Forh is not entitled to federal habeas relief on ground one.

## B. Ground Two

As ground two, Forh asserts that counsel (Raymond Hill, Florida Bar #032709) was ineffective because he failed to investigate and develop an alibi defense based on cell phone records that placed Forh in Jacksonville at the time of the St. Augustine robbery. <u>See</u> Petition at 6. He raised the ineffectiveness claim in his Rule 3.850 motion. <u>See</u> Doc. 9-9 at 84-87. After an evidentiary hearing, the postconviction court ultimately denied the Rule 3.850 motion with respect to the claim, stating in pertinent part:

> THIS CAUSE is before this Court on Defendant's Motion for Post-Conviction Relief, filed pursuant to Rule 3.850, Fla. R. Crim. P. The Court has considered the Defendant's motion, the State's response, the Defendant's reply to the State's response, testimony received during the March 16, 2018 evidentiary hearing, and the written closing arguments of counsel. Being fully advised in the premises, the Court finds as follows:
>
> The Defendant was found guilty by jury verdict of robbery with a firearm and was subsequently sentenced to serve 30 years in prison. The Defendant filed the instant motion for post-conviction relief asserting five claims of ineffective assistance of counsel. On October 26, 2017, this Court entered an interim Order on the Defendant's motion summarily

denying portions of ground one, as well as all of grounds two, three, and four. The Court scheduled an evidentiary hearing on that portion of ground one wherein the Defendant asserted his trial counsel was ineffective by not pursuing an alibi defense by utilizing cell phone records obtained by police showing at the time of the robbery the Defendant's phone was not near the robbery scene. The Court conducted the evidentiary hearing on March 16, 2018. The Defendant was represented by court-appointed counsel at the evidentiary hearing. At the evidentiary hearing, the Court received testimony from St. Johns County Sheriff's Deputy Sgt. David Garns, the Defendant, and the Defendant's trial counsel attorney Raymond Hill.

On August 21, 2011, Douglas Burnett, a St. Augustine attorney, was robbed at gunpoint in the bathroom at the St. Augustine Outlet Mall. (Tr. 42-50)[.] Mr. Burnett identified the Defendant as the armed robber prior to trial in a photospread (Tr. 63-65) as well as in court (Tr. 44). While Mr. Burnett was using the bathroom and was subsequently robbed, his wife and step-daughter were outside the bathroom waiting on him. Mr. Burnett's wife Araan observed the Defendant walk out of the bathroom while sticking a gun in his waistband. (Tr. 137-138) Mrs. Burnett likewise identified the Defendant as the person she saw exiting the bathroom putting a gun in his waistband. (Tr. 139-140, 146) Mr. Burnett's step-daughter also identified the Defendant as the person exiting the bathroom with a gun in his waistband. (Tr. 182-184) The Defendant was subsequently arrested by police for the armed robbery for which he was tried and convicted.

During the course of the investigation, the police obtained the records for the cell phone number identified as belonging to the Defendant. Those records showed that based on cell tower activity the cell phone was in Jacksonville around the time of the

robbery. The Defendant's trial counsel chose to not utilize the phone records during the trial. The Defendant contends his lawyer provided ineffective assistance of counsel by not using the cell phone records to establish an alibi for him.

The Defendant was represented at trial by attorney Raymond Hill, who the Defendant had privately retained.[14] Mr. Hill testified at the evidentiary hearing that he was aware of the existence of the phone records before trial, having received them in discovery, and discussed them with the Defendant.[15] Mr. Hill testified he met with the Defendant at least six times prior to trial and asked him if he had any recollection of his whereabouts at the time of the crime, or if anyone could establish his whereabouts, in order to attempt to corroborate the cell phone records.[16] Mr. Hill further testified he also met with the Defendant's wife at least two times before trial to see if she could provide any information on the Defendant's whereabouts at the time of the robbery.[17] Mr. Hill testified that neither the Defendant nor his wife ever provided any information on the Defendant's whereabouts at the time of the crime. Mr. Hill further testified he made the strategic decision to not introduce the phone records at trial because those records merely show where the phone was located at that time — not where the Defendant was located, and neither the Defendant nor his wife could give him any indication where the Defendant was at that time.[18] Mr. Hill further testified that he discussed with the Defendant his decision not to use

---

[14] See Doc. 9-13 at 14-15.

[15] See Doc. 9-13 at 15, 23.

[16] See Doc. 9-13 at 16-17.

[17] See Doc. 9-13 at 17-18.

[18] See Doc. 9-13 at 20.

the cell phone records and the Defendant responded[,] "you're the lawyer, I'll follow your lead."[19] The Defendant did not testify at trial.

The Defendant acknowledged during the evidentiary hearing that he and his lawyer discussed the phone records before trial.[20] The Defendant testified at the evidentiary hearing that on the day of the robbery he now recalls he had gone to the Jacksonville Landing shopping center to purchase some frames and then to some garage sales in Jacksonville.[21] However, the Defendant acknowledged he never gave this information to his lawyer.[22] **The Court finds the Defendant's testimony at the evidentiary hearing was not credible.** It defies logic that now, for the first time at the evidentiary hearing, the Defendant recalled being in Jacksonville and what he was doing on the specific date of the robbery, nearly seven years earlier. Further, it makes no sense that the Defendant now knows of his whereabouts at the time of the robbery; however, when his lawyer asked him at least six times before trial if he could account for his whereabouts, the Defendant never mentioned it to his lawyer.

Mr. Hill further testified at the evidentiary hearing that had the Defendant told him before trial that he had been at the Jacksonville Landing on the date of the robbery, he would have immediately gone to the Jacksonville Landing in an attempt to secure video surveillance footage that may have shown the Defendant.[23]

---

[19] <u>See</u> Docs. 9-13 at 21; 9-14 at 7-8.

[20] <u>See</u> Doc. 9-12 at 10.

[21] <u>See</u> Doc. 9-12 at 16, 20-21.

[22] See Doc. 9-12 at 16-17.

[23] <u>See</u> Doc. 9-13 at 20-21.

Sgt. Garns testified at the evidentiary hearing that on October 3, 2011, he went to the Defendant's residence and spoke with him.[24] The Defendant told him at that time that he had been to the St. Augustine Outlet Mall approximately one month prior, but could provide no further detail as to the specific date.[25] The robbery in this case took place approximately one and one-half months prior to the date the Defendant spoke with [] Sgt. Garns. (Tr. 163-164)

. . . .

Considering that neither the Defendant nor his wife were able to account for his whereabouts at the time of the offense, the Defendant didn't testify at trial, and that cell phone records do not establish where a person is located, only where the cell phone is located, the Court cannot conclude that Mr. Hill's decision to not use the phone records was unreasonable. Thus, the Defendant has not established his trial counsel acted outside the wide range of reasonably competent performance under prevailing professional standards by not utilizing the cell phone records. See also Reed v[.] State, 875 So.2d 415, 429-30 (Fla. 2004) (ineffective assistance claim based on failure to present alibi defense properly rejected when counsel investigated and made a strategic decision to not present defense)[.]

Moreover, assuming arguendo that trial counsel's failure to utilize the phone records at trial fell below the standard of reasonably competent representation, this Court cannot conclude there is a reasonable probability that the result of the trial would have been different had the cell phone records

---

[24] See Doc. 9-12 at 2-3.

[25] See Doc. 9-12 at 3.

been introduced at trial. As discussed above, cell phone records only reveal where a phone is located, not a person. Here, the Defendant was not only positively identified by the victim in a pretrial photospread, but also in court. The Defendant was also positively identified by the victim's wife and step-daughter. Even had the defense introduced the phone records without more at trial, the State easily could have argued to the jury that someone else had possession of the phone at that time, or the Defendant had left the phone in Jacksonville. There is no reasonable probability the outcome of the case would have been different had the cell phone records been used at trial.

Doc. 9-16 at 2-9 (emphasis added and footnote omitted). The Fifth DCA affirmed the postconviction court's denial of relief. See id. at 74.

To the extent that the appellate court decided the claim on the merits,[26] the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of the claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Forh is not entitled to relief on the basis of this ineffectiveness claim.

---

[26] In looking through the appellate court's per curiam affirmance to the circuit court's "relevant rationale," the Court presumes that the appellate court "adopted the same reasoning." Wilson, 138 S. Ct. at 1192.

Nevertheless, even if the appellate court's adjudication of the claim is not entitled to deference, Forh's ineffectiveness claim is still without merit. The record supports the postconviction court's conclusion. After the evidentiary hearing in state court concerning this issue, the court resolved the credibility issue in favor of believing counsel's testimony over that of Forh. The Court notes that credibility determinations are questions of fact. See Martin v. Kemp, 760 F.2d 1244, 1247 (1985) (per curiam) (finding that factual issues include basic, primary, or historical facts, such as external events and credibility determinations). In federal habeas review, a state court's factual determination is presumed correct unless the petitioner can rebut the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Here, Forh has not rebutted the trial court's credibility finding by clear and convincing evidence. See Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). As such, the state court's factual findings which are presumed correct refute the claim regarding counsel's alleged deficiencies in investigating and putting forward an alibi defense based on the cell phone records. Given the trial court's credibility determination, Forh's claim is wholly unsupported, and therefore fails.

There is a strong presumption in favor of competence when evaluating the performance prong of the Strickland ineffectiveness inquiry. See Anderson v. Sec'y, Fla. Dep't of Corr., 752 F.3d 881, 904 (11th Cir. 2014). The inquiry is

"whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. "[H]indsight is discounted by pegging adequacy to 'counsel's perspective at the time' . . . and by giving a 'heavy measure of deference to counsel's judgments.'" Rompilla v. Beard, 545 U.S. 374, 381 (2005). Thus, Forh must establish that no competent attorney would have taken the action that his counsel chose.

Notably, the test for ineffectiveness is neither whether counsel could have done more nor whether the best criminal defense attorneys might have done more; in retrospect, one may always identify shortcomings. Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (stating that "perfection is not the standard of effective assistance") (quotations omitted). Instead, the test is whether what counsel did was within the wide range of reasonable professional assistance. Ward, 592 F.3d at 1164 (quotations and citation omitted); Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1099 (11th Cir. 2007) ("The question is whether some reasonable lawyer at the trial could have acted as defense counsel acted in the trial at issue and not what 'most good lawyers' would have done.") (citation omitted).

On this record, Forh has failed to carry his burden of showing that his counsel's representation fell outside that range of reasonable professional assistance. Even assuming arguendo deficient performance by defense counsel,

36

Forh has not shown any resulting prejudice. He has not shown that a reasonable probability exists that the outcome of the case would have been different if counsel had acted as Forh claims he should have. His ineffectiveness claim is without merit since he has shown neither deficient performance nor resulting prejudice. Accordingly, Forh is not entitled to federal habeas relief on his ineffectiveness claim in ground two.

### VII. Certificate of Appealability
### Pursuant to 28 U.S.C. § 2253(c)(1)

If Forh seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Forh "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El, 537 U.S. at 335-36 (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

See <u>Slack</u>, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Id.</u> Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED**:

1.       The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.       The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.       If Forh appeals the denial of the Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4.     The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 3rd day of January, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-1 1/3
c:
Isaac Sieh Forh, FDOC #J45908
Counsel of Record